BRENDA SPAR,                         )
                                     )
          Plaintiff                  )
                                     )
          v.                         )   Case No. 2:07 cv 210
                                     )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,                  )
                                     )
          Defendant                  )

OPINION AND ORDER

This matter is before the court on the petition for judicial
review of the decision of the Commissioner of Social Security
filed by the plaintiff, Brenda Spar, on June 26, 2007.  For the
reasons set forth below, the decision of the Commissioner is
**AFFIRMED.**

Background

The claimant, Brenda Spar, applied for Disability Insurance
Benefits on December 15, 2004, alleging a disability onset date
of July 4, 2000.  (Tr. 23)  Finding Spar not disabled, the claim
was denied on March 17, 2005.  (Tr. 51-54)  Spar requested re-
consideration of the finding on April 20, 2005.  (Tr. 56)  Upon
reconsideration, the claim was denied on July 11, 2005.  (Tr. 57-
59)  Spar requested a hearing before an Administrative Law Judge
on August 25, 2005.  (Tr. 60)  A hearing before ALJ John E. Meyer
was held on October 19, 2006, at which Spar, her husband Christo-
pher Spar, medical expert (ME) Ashok G. Jilhewar, M.D., and voca-
tional expert Dr. Leonard M. Fisher, testified.  (Tr. 23)  On

November 20, 2006, the ALJ found that Spar was not disabled between the onset date, July 4, 2000, and the date of the decision. (Tr. 23-30) The ALJ found that Spar could perform the full range of sedentary work in the national economy. (Tr. 27-30) Following a denial of her request by the Appeals Council on February 23, 2007, Spar filed a complaint in this court on June 26, 2007.

Brenda Spar was born on December 23, 1958, making her 47 years old at the time of the hearing before the ALJ. (Tr. 61) From 1989 to 2001, Spar worked in a number of occupations including customer account specialist, customer service representative, manager and recruiter, receptionist, and telemarketer. (Tr. 65) After her stated onset date, Spar worked as a telemarketer for over four months and as a receptionist for a period of time. (Tr. 64) Spar reported that her illnesses and injuries affect her daily living. (Tr. 63-75) Spar indicated:

> I am unable to leave the house for long periods of time due to the Diarrhea and the pain and sickness it causes. I am very week [sic]. My immune system is week [sic]. I cannot travel in a car because I have to make sure I am near a Toilet. I have severe low back pain at times. I am also being treated for Depression and anxiety and concentration is difficult at times. My energy level is low, I get fatigued very quickly. I have to lay down and rest after the smallest activity around the house I feel pain in the abdomen everyday. I have many adhesions from the multiple abdominal surgeries. The attacks of Diarrhea are painful and frequent, they are stagnate due to the bacterial overgrowth and smell very unpleasant. It usually happens after I eat anything. I am depressed and

2

suffer from anxiety due to my medical prob-
lems and my lack of productivity.

(Tr. 64)

Spar's relevant medical history relates back to 1986, when
she was involved in a car accident resulting in injury to her
spleen, liver, and vena cava. (Tr. 114) Spar underwent surgery
on her liver, and her spleen was removed. (Tr. 114-116, 354,
369) From June 28, 2000, until July 4, 2000, Spar was hospital-
ized, complaining of severe pain to her abdomen. (Tr. 123) Spar
was diagnosed with gallstones. (Tr. 123) Dr. M. Nabil Shabeeb
performed a laparotomy, cholecystectomy, and cholangiography,
resulting in the removal of Spar's gallbladder. (Tr. 123, 126-
27) On a follow-up visit with Dr. Shabeeb, it was noted that
Spar was "doing well." (Tr. 121)

On January 12, 2001, Spar entered the hospital as an outpa-
tient due to primary infertility. (Tr. 147, 155) Dr. Jin Cha
performed a diagnostic laparoscopy and tubal insufflations on
Spar which revealed enlarged ovaries that appeared cystic. (Tr.
149) On both January 13 and 14, 2001, Spar's husband called the
hospital and stated that Spar was vomiting and complaining of
abdominal pain. (Tr. 155) Though it was recommended, Spar at
first refused to go to the emergency room. (Tr. 155) On January
15, 2001, Spar went to the emergency room and was admitted for an
exploratory laparotomy for possible bowel resection. (Tr. 155)
Spar was diagnosed with a small bowel perforation, enterocuta-
neous fistula, and anemia. (Tr. 159-60) Dr. Shabeeb performed

surgery on January 15, 2001, resulting in a 17.5 centimeter portion of her bowel being removed. (Tr. 163, 194, 199)

Post-operatively, Spar developed a wound infection and experienced pelvic fluid collection. (Tr. 163, 180) Spar underwent pelvic fluid drainage in early February 2001, which was performed by Dr. Thomas Maginot. (Tr. 177-78) The fluid, a dark bloody mixture, was contained or divided into various small spaces in Spar's body. (Tr. 177-78) Dr. Maginot was able to aspirate only two of the compartments. (Tr. 177-78) Afterward, Dr. Shabeeb's final chart notes indicate that Spar "did well," and "[h]aving reached maximum acute care benefit," Spar was discharged from the hospital on February 27, 2001. (Tr. 163)

Spar underwent follow-up examinations on April 3, 2001, and June 6, 2001. (Tr. 226-230) During the April examination, Dr. Thomas Hoess administered CT scans of Spar's abdomen and pelvis. (Tr. 229-30) The scan of the abdomen found dilation of the interhepatic and extra-hepatic ducts. (Tr. 229) The scan of the pelvis noted an irregular collection of fluid that had slightly decreased in size in comparison to a previous scan. (Tr. 230) During the June examination, Dr. Randolph G. Roberts administered CT scans of Spar's abdomen and pelvis. (Tr. 226-27) Dr. Roberts' chart notes indicated that there were no fluid collections in Spar's abdomen and dilatation of the left lobe of Spar's liver remained unchanged as compared to the April abdomen scan. (Tr. 226) In addition, Dr. Roberts again noted fluid collection

in Spar's pelvis that was similar in configuration to the April scan. (Tr. 227)

In November 2001, Spar was admitted to the University of Chicago Hospital, where she underwent an exploratory laparotomy, lysis of adhesions, left salpingectomy, right ovarian cystectomy, and a scar revision. (Tr. 295, 298) During the procedure, Spar's left fallopian tube was removed. (Tr. 291) Spar was discharged two days after admission "on a regular diet, ambulating, afebrile, and adequate voiding." (Tr. 296, 299)

On March 22, 2002, Spar was admitted to the emergency room complaining of vomiting, diarrhea, and abdominal pain. (Tr. 241) Spar indicated that she had been experiencing diarrhea over the previous three days. (Tr. 241) Dr. Jonathon T. Lee took CT scans of Spar's abdomen and pelvis which found bile duct dilatation and a low density collection of fluid in the abdomen and free fluid in the pelvis. (Tr. 248-49)

In September 2004, Spar began seeing Dr. Sunanda Kane, a gastroenterologist and assistant professor of medicine at the University of Chicago. (Tr. 287) Dr. Kane's notes indicate that Spar was doing "okay" after her earlier surgeries until approximately three months before her visit, when she began experiencing diarrhea. (Tr. 286) Prior to this Spar had "frequent, loose stools followed by periods of constipation, straining, and hard stools." (Tr. 286) Spar complained of "gas, bloating, lower back pain, and rectal pain along with stools that were yellow in color at times and very runny and foul smelling." (Tr. 286) Dr.

5

Kane noted that Spar had a decrease in appetite but experienced "no sustained weight loss, nausea or vomiting." (Tr. 286) However, on the next page, Dr. Kane indicated that Spar complained of "some weight loss, fatigue, and weakness" and dizziness. (Tr. 287)

Dr. Kane suspected that Spar suffered from bacterial overgrowth. (Tr. 287) Dr. Kane ordered a small bowel series which was unremarkable, and showed an unobstructive bowel gas pattern, normal transit time, and freely mobile bowel loops. (Tr. 285) In addition, Dr. Kane started Spar on Xifaxan as an alternative to antibiotics and ordered labs. (Tr. 287) The labs indicated that both her serum potassium and serum albumin were within the reference amounts.[1] (Tr. 308) Dr. Kane recognized that although Spar had a history of anxiety "[s]he is stable on her Paxil." (Tr. 288) A colonoscopy performed on October 11, 2004, was normal, finding normal colonic mucosa and no masses or polyps. (Tr. 283-84)

In a follow-up visit occurring on May 6, 2005, Dr. Kane noted that Spar cycled her antibiotics and continued to experience baseline diarrhea with episodes of yellow, watery, and foul-smelling stools. (Tr. 282) Dr. Kane stated, "She will take Xifaxan at that time and she will feel back to baseline." (Tr. 282) As to Spar's bacterial overgrowth, Dr. Kane noted that Spar

_____

[1] In fact, Spar's serum potassium and serum albumin values remained equal to or inside the reference values for labs testing and which were completed on August 31, 2001, October 22, 2001, November 9, 2001, February 11, 2004, and September 10, 2004. (Tr. 308-313)

was "doing very well on cyclical Xifaxan." (Tr. 282) Additionally, Dr. Kane, noting Spar's history of depression, stated that Spar had responded well to Celexa, and therefore Dr. Kane prescribed the drug to Spar. (Tr. 282)

A DDS physical residual functional capacity ("RFC") assessment was completed on March 8, 2005. (Tr. 260-267) Spar was found able to lift 20 pounds occasionally and ten pounds frequently, capable of standing and walking for about six hours in an eight hour workday, sitting with normal breaks for about six hours in an eight hour workday, and not limited in her ability to push or pull. (Tr. 261) Additionally, the report recognized that Spar suffered from bacterial overgrowth which "restricts her from working away from a bathroom facility." (Tr. 261) The assessment found that Spar "should only occasionally due [sic] work-like tasks like climbing, stooping, kneeling, crouching, and crawling due to her irritable bowel syndrome caused by her resection surgery." (Tr. 262)

On February 8, 2005, Spar underwent a mental status examination by Dr. Patrick J. McKian. (Tr. 254-257) Dr. McKian's report indicated that Spar had problems with depression and anxiety, she had seen a therapist in the past, and she was not seeing a therapist at the time of her examination. (Tr. 254) As to her daily activities, Spar indicated that she attempted to do household chores, read, exchanged emails, cared for pets, and watched television. (Tr. 255-56) Dr. McKian's impressions from the examination indicated that Spar suffered from:

7

> Adjustment Reaction with mixed emotionally
> features, primary secondary to life stresses
> such as divorce and presently her medical
> problems. Claimant is being treated by a
> psychiatrist with an anti depressant but has
> never really received psychotherapy. Claim-
> ant's primary problems appear to at this time
> be medical and much of her depression and
> anxiety appear to be related to her medical
> problems.

> (Tr. 257)

Additionally, a DDS psychiatric review of Spar's condition was completed on March 10, 2005. (Tr. 268-281) This review found that Spar suffered from non-severe impairments including depressive syndrome and generalized persistent anxiety. (Tr. 268, 271, 273) The B Criteria assessment from this review, however, found that Spar had only mild impairment in the categories of activities of daily living, maintenance of social functioning, and maintenance of concentration, persistence, or pace, and had no limitations for episodes of decompensation. (Tr. 278)

In response to her May 6, 2005 examination of Spar, Dr. Kane completed a Physical RFC Questionnaire. (Tr. 314-318) Dr. Kane diagnosed Spar with small bowel bacterial overgrowth syndrome and irritable bowel syndrome, dating back to August 2004. (Tr. 314, 317) Dr. Kane identified a distended abdomen and unformed stool as findings and objective signs of Spar's conditions. (Tr. 314) Despite these conditions, Dr. Kane gave Spar a "good" prognosis. (Tr. 314) Dr. Kane indicated that Spar had emotional factors that contributed to her symptoms and that functional limitations, depression, and anxiety affected her physical condition. (Tr.

315)  Furthermore, although Dr. Kane completed the form indicat-
ing that Spar would experience frequent interference with her
attention and concentration from pain and other symptoms,  she
also indicated that Spar was capable of performing low stress
jobs.  (Tr. 315)

    As to functional limitations on Spar, Dr. Kane's RFC indi-
cated that Spar could walk one block without rest or severe pain,
could sit for 45 minutes and stand for 30 minutes at a time, sit
for about four hours and stand for less than two hours in an
eight hour day, and walk for a period of five minutes every 60
minutes.  (Tr. 315-16)  Dr. Kane noted that Spar needed to be
able to switch positions at will and that she will need to take
unscheduled breaks during an eight hour workday.  (Tr. 316)  Dr.
Kane indicated that these breaks likely would occur one time per
week and require 15 minutes of rest.  (Tr. 316)  Spar could lift
ten pounds occasionally and lift less than ten pounds frequently.
(Tr. 316)  As to activities, Dr. Kane's RFC indicated that Spar
occasionally could twist, climb ladders, and climb stairs, but
Spar rarely could stoop and crouch/squat.  (Tr. 317)  Finally,
Dr. Kane indicated that Spar likely would be absent from work for
more than four days per month. (Tr. 317)

    Also included in the record is a transcribed, unsigned
statement from a telephone conference with Dr. Kane occurring on
February 7, 2005.  (Tr. 319-20)  Dr. Kane concluded that Spar's
bacterial overgrowth and bowel problems were a result of perito-
nitis and bowel resection.  (Tr. 319)  Dr. Kane continued,

stating that Spar's symptoms did not manifest for three years, which was not unusual after peritonitis and resection. (Tr. 319) Dr. Kane mentioned that Spar periodically would take antibiotics for the rest of her life. (Tr. 319) Dr. Kane stated that, because part of Spar's liver was dead, treatment options were limited. (Tr. 320) Dr. Kane opined that Spar suffered from chronic anxiety disorder, which as an emotion, could affect the bowel. (Tr. 320) Dr. Kane concluded:

> Is Brenda disabled? I guess she has such altered bowel habits that it would be hard for her to find steady employment. She has chronic diarrhea and because of her conditions, she doesn't get the normal signals that the body gives . . . . She has all sorts of problems and when she has to go she has to go now. She can't delay because she is in a car or on the phone or at a clients [sic]. That is pretty disruptive and limits her ability to work. I'm not sure how much pain comes into it. I think it's primarily a bowel control issue.

(Tr. 320)

Between August 11, 2006, and August 25, 2006, Spar visited David Cohen, M.D., at the University of Chicago Hospital, complaining of a "bacterial growth" problem and chronic diarrhea. (Tr. 326) Spar underwent an ultrasound which found a large pocket of fluid collection. (Tr. 323, 324) Labs performed on August 21, 2006, indicated that Spar's serum potassium was within the reference value range. (Tr. 327-28) On August, 25, 2006, Dr. Cohen drained 650 cc of straw colored fluid from the fluid collection in Spar's abdomen. (Tr. 333) The fluid was analyzed by Quest Diagnostics and found no evidence of malignancy, no

10

anaerobic bacteria, and no growth of aerobic bacteria. (Tr. 334-
35)

At the hearing before ALJ Meyer, Spar testified that after
her health problems began, she was relegated to part-time work,
but that she could not even do that anymore. (Tr. 354) Spar
stated that the complications associated with the perforation and
subsequent resection of her bowel caused a bacteria growth in
pockets of her intestines. (Tr. 356-57) Describing her symp-
toms, Spar stated that she became feverish and nauseous and
developed diarrhea and cramping. (Tr. 357) As to the effects of
her conditions, Spar stated, "Basically, it just knocks me out.
I have to lay down, and I have to ride the storm out." (Tr. 357)
Spar stated that she and Dr. Kane determined that she had flare-
ups of the bacterial overgrowth every three months. (Tr. 357,
358) Spar indicated that she took Xifaxan for the flare-ups,
which she knew was occurring when her bowel smelled "horrible."
(Tr. 357-58) Spar said that Xifaxan "does help because after
taking it, it seems to calm down the symptoms. Of you know, the
diarrhea, and the nausea, and the pain, and fever." (Tr. 361)

In describing her lifestyle as a result of her symptoms and
condition, Spar stated, "Basically, when I know I have things
like this going on, or I have to plan things, I try and plan my
life around my bowel movements. Or I have to know where bath-
rooms are and how to get to them." (Tr. 359) Spar also indi-
cated that she did not leave her home for long periods and did
not leave when she had flare-ups, because it "drains" her physi-

cally. (Tr. 359) Spar stated that her condition limited her ability to do basic things, which was stressful, and that her condition caused her to excrete into her pants, which was "very humiliating, it's humiliating . . . it's a horrible thing to ever have to go through." (Tr. 359-60) When questioned about pain in her stomach, Spar stated that something always was going on in her stomach, but she was "so used to it." (Tr. 362) Spar explained that fatigue caused small tasks to take more time to complete and sometimes prevented her from even trying to do them. (Tr. 364) Spar emphasized that it could take her four days to dust a small bedroom. (Tr. 364) Additionally, Spar indicated that her husband did a lot of the household work, stating that he had "taken over a lot of my wifey household duties, which you know, it's hard for me to accept." (Tr. 364)

Her husband testified that Spar was under a great deal of stress. (Tr. 367) He indicated that it was like Spar had the flu for four to six days when she had extreme flare-ups, which could cause her to spend those days in bed. (Tr. 367) He testified, "[O]ne out of three days is a really good day when she really doesn't have any other problems." (Tr. 367)

The medical expert, Dr. Jilhewar, testified that Spar's resection would not have an effect on her small bowel function because it was only 17 inches of a 22 foot long bowel and the terminal island was not removed. (Tr. 371) However, the ME explained that a consequence of the procedure was that Spar experienced "intra[-]abdominal upsets." (Tr. 371) The ME stated

that Spar's recovery from her procedure was good until March 3, 2002, when she went to the emergency room after experiencing three days of diarrhea. (Tr. 372) The ME testified that the medical records did not contain specific medical documentation of episodes of diarrhea causing Spar to remain in bed for four or more days. (Tr. 372) Based on Spar's complaints of diarrhea in the three months preceding her visit to Dr. Kane on September 15, 2004, the ME stated that Spar's documented onset date was June 15, 2004. (Tr. 373) He testified that the tests ordered by Dr. Kane were all normal. (Tr. 373) Specifically, Dr. Jilhewar referenced Spar's chemistry profile, stating that if Spar had chronic uncontrolled diarrhea, her serum potassium and serum albumin levels would have to be abnormally low. (Tr. 374) In Spar's case, however, the ME noted that these values never were low. (Tr. 374)

The ME also discussed the prognosis that Dr. Kane gave the claimant and disagreed with a number of her findings. (Tr. 374-376) Specifically, Dr Jilhewar stated that he could not reconcile Dr. Kane's statement that Spar was "doing well on cyclical Xifaxan" with Dr. Kane's RFC indicating less than sedentary work. (Tr. 374) The ME stated that Dr. Kane's record indicated that Spar had a history of depression, but noted that she was not depressed the day of her office visit. (Tr. 375) Dr. Jilhewar opined that because Spar responded well to Celexa, her depression was in remission. (Tr. 375) When Spar's attorney read the transcript of Dr. Kane's February 2005 conversation into the

13

record, it did not change the ME's opinion. (Tr. 381) Regarding Spar's RFC, the ME indicated that she had sedentary capacity, allowing her to lift ten pounds occasionally, sit indefinitely, and stand for two hours in an eight hour day. (Tr. 382) As to Spar's psychological conditions, the ME stated, "I'm not saying that she is not depressed. I'm not saying she doesn't have anxiety. Nor I am [sic] saying that she doesn't have these episodes. What I am saying, that I don't have objective documentation." (Tr. 383)

Responding to questioning, the ME stated that the right lobe of Spar's liver is compensating for the left lobe and that conditions related to her bile ducts were stable since 1986. (Tr. 386) In response to questioning related to effects of adhesions, Dr. Jilhewar indicated that there was no documentation of the effects of adhesions in Spar's history. (Tr. 389) However, the ME indicated that severe pain "is usually the clinical result of the extensive adhesions." (Tr. 390) Basing his conclusion on Dr. Kane's notes, the ME indicated that he disagreed with the statement that Spar would be required to be absent more than four days per month. (Tr. 391)

The vocational expert ("VE"), Dr. Fisher, described Spar's past work as a customer account specialist, manager/recruiter, and a recruiter as skilled and sedentary, receptionist and telemarketer as semi-skilled and sedentary, and customer service representative as semi-skilled and light. (Tr. 393-94) The ALJ's initial hypothetical question asked the VE to consider a

person of Spar's age, education, past work experience, and able to perform a full range of sedentary work. (Tr. 394) Dr. Fisher responded that there would be thousands of jobs in the semi-skilled to skilled range and thousands of jobs at the sedentary unskilled level. (Tr. 395) Next, the ALJ asked the VE to retain all of the factors in the initial hypothetical question and add limitations that the individual would only be able to stand for two hours and sit for four hours in an eight hour period and would miss four or more days per month. (Tr. 395) The VE responded that he did not believe there were jobs such an individual could do in the national economy. (Tr. 396)

Spar's attorney posed a hypothetical where an individual would have problems with concentration and attention affecting her one third of the time. (Tr. 396) The VE responded that if there is a major effect for one-third of the time, then "you're not going to function in competitive employment." (Tr. 396) Next, Spar's attorney asked the VE about the stress level of her past work and her ability to function in those jobs with stress. (Tr. 397) The VE responded that he would not call the jobs low stress and that stress is relative to an individual person. (Tr. 397) However, the VE commented that it would "be hard to deal with a job" if minimal stress upset an individual. (Tr. 398) Finally, Spar's attorney asked the VE if the jobs he indicated would allow an individual to take bathroom breaks for five minutes every hour. (Tr. 398) The VE indicated that the indi-

vidual could take breaks in professional and semi-professional jobs, but not in the lower level jobs.

In his decision, the ALJ found that Spar was not disabled at anytime from July 4, 2000, through November 20, 2006. (Tr. 30) The ALJ found that Spar suffered from chronic diarrhea, a severe impairment. (Tr. 25) In making that determination, the ALJ referenced Spar's medical records describing both her conditions and her treatments and the medical expert's testimony. (Tr. 25-27) The ALJ agreed with the state psychologist that Spar suffered from depressive and anxiety disorders, which were non-severe impairments. (Tr. 26) Next, the ALJ found that Spar had the RFC to perform the full range of sedentary work. (Tr. 27) The ALJ noted that Spar testified that she suffered from diarrhea and irritable bowel syndrome, and every three months experienced flare ups referred to as bacterial overgrowth. (Tr. 27) The ALJ noted testimony that this overgrowth caused "horrible" odor and that her condition made her feel tired, put her under a great deal of stress, and caused her to stay in bed for at least three or four days a month. (Tr. 37) In evaluating the credibility of Spar's complaints, the ALJ related:

> After evaluating the clinical signs, laboratory findings and other evidence of record, I find the claimant's impairment could reasonably be expected to produce *some* of her alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these are not entirely credible. Notably, Dr. Jilhewar stated, and I agree, that the frequency of the claimant's diarrheic episodes is not documented in the record. (emphasis in original).

(Tr 27)

The ALJ specifically referred to the unremarkable small bowel series and colonoscopy, stable weight, normal serum albumin and potassium levels, no systemic side effects, and Spar's progress on Xifaxan as bases for this finding. (Tr. 28) In addition, the ALJ found that Spar's other proffered impairments - an abscess in her bowel, dilation of her bile duct, and small bowel perforation - were not supported as current impairments that contributed to her claim of disability. (Tr. 28)

Next, the ALJ pointed to discrepancies in Dr. Kane's diagnosis, prognosis, and RFC assessment. (Tr. 28) Specifically, the ALJ pointed to inconsistencies between Dr. Kane's RFC indicating less than full-time work and her "good" prognosis and statements that Spar was doing "very well" on Xifaxan. (Tr. 28) Likewise, the ALJ noted inconsistencies between Dr. Kane's written record indicating that pain would affect Spar's attention and concentration and her transcribed telephonic statement that indicated "I am not sure how much pain comes into it." (Tr. 28) The ALJ also found it inconsistent that flare-ups that occur once every three months would require Spar to miss four days of work each month. (Tr. 28) The ALJ noted that Dr. Kane's opinion normally would be given great weight, but the inconsistencies did not make her assessment reliable. (Tr. 28)

As a result, the ALJ adopted the ME's RFC analysis, which found Spar capable of "performing the range of sedentary work despite her impairment." (Tr. 28) The ALJ found that the

17

activities Spar performed in her past work were fully compatible with sedentary work, adopting the VE's testimony in this regard. (Tr. 29)  Therefore, the ALJ concluded, "I find the claimant is able to perform all past jobs as she actually performed them and all but the customer service job as generally performed."  (Tr. 29)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* *Consolidated Edison Company v. NRLB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)); *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot

18

stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that she is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  20 C.F.R. §404.1520.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity."  20 C.F.R. §404.1520(b).  If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. §404.1520(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews

the claimant's "residual functional capacity" (RFC) and the physical and mental demands of her past work.  If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled.  20 C.F.R. §404.1520(e).  However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Here, Spar claims that the ALJ erred in four ways.  First, she asserts that he failed to include symptoms related to Spar's chronic diarrhea and other impairments in his RFC assessment in violation of Social Security Ruling 96-8p.  Second, Spar charges that the ALJ ignored vocational testimony that was favorable to Spar.  Third, she argues that his credibility determination was contrary to Social Security Ruling 96-7p.  Fourth, Spar alleges that the ALJ failed to give proper weight to the opinions of Spar's treating physician, Dr. Kane.

Spar's initial claim is that the ALJ erred in failing to include symptoms related to her chronic diarrhea and other impairments in his residual functional capacity determination. SSR 96-8p specifically spells out what is required in an ALJ's RFC analysis.  This section of the ruling provides:

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities and observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. (footnote omitted)

SSR-96-8p

Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in his written decision. *Morphew v. Apfel,* 2000 WL 682661, *3 (S.D. Ind. Feb. 15, 2000). *See Lawson v. Apfel*, 2000 WL 683256, *2-4 (S.D. Ind. May 25, 2000) (ALJ who restricted the claimant to medium work satisfied the requirements of SSR 96-8p) ("[SSR-96-8p] does not require an ALJ to discuss all of a claimant's abilities on a function-by-function basis. Rather an ALJ must explain how the evidence supports his or her conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained worked activities."). The text of SSR 96-8p continues:

In all cases in which symptoms, such as pain, are alleged, the RFC assessment must: Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal

21

> observations, if appropriate; Include a reso-
> lution of any inconsistencies in the evidence
> as a whole; and Set forth a logical explana-
> tion of the effects of the symptoms, includ-
> ing pain, on the individual's ability to
> work.
>
> SSR 96-8p

Once the plaintiff has established a medically determinable

impairment that could produce the claimant's alleged pain and

symptoms

> but the intensity or persistence of the pain
> is unsubstantiated by the medical record, the
> ALJ is obliged to examine and weigh all the
> evidence including observations by treating
> and examining physicians, third-party testi-
> mony, the claimant's testimony and daily
> activities, functional restrictions, pain
> medications taken, and aggravating or precip-
> itating factors to evaluate how much the
> claimant's impairment affects his ability to
> work.
>
> **Herron v. Shalala**, 19 F.3d 329, 334 (7th Cir.
> 1994)

**Crosby v. Apfel**, 248 F.3d 1157, *4 (7th Cir 2000)(table). In

making his determination, "the ALJ must evaluate all limitations

that arise from medically determinable impairments, even those

that are not severe, and may not dismiss a line of evidence

contrary to the ruling." **Villano v. Astrue**, 2009 WL 196550, *4

(7th Cir. Jan. 26, 2009)(*citing* S.S.R. 96-8p; **Golembiewski v.

Barnhart**, 332 F.3d 912, 917 (7th Cir. 2003)(finding that the ALJ

erred in failing to discuss the combined effect of all impair-

ments, drew improper inferences from the lack of object medical

evidence, and failed to discuss the plaintiff's depression)).

To establish her claim that the ALJ erred in failing to apply her symptoms and conditions in his RFC assessment, Spar cites *Spaulding v. Barnhart*, 2004 WL 1093312 (N.D. Ill. 2004). In *Spaulding*, the plaintiff sought disability benefits for gastrointestinal problems including nausea, diarrhea, vomiting, and abdominal pain, which would force her to take unscheduled breaks from and miss entire days of work.  The ALJ found that was "some medically determinable basis for her complaints, however the nature of the objective findings reveals that her complaints have been out of proportion to the objective clinical findings." *Spaulding*, 2004 WL 1093312 at *7.  The reviewing court's opinion is instructive:

> Finding that plaintiff's complaints regarding the severity of her symptoms are not entirely credible, given all of the evidence on record, does not answer the question whether plaintiff's symptoms preclude her from employment.  Nonetheless, the ALJ jumps from this finding to the conclusion that plaintiff can perform the tasks of her former employment.  In reaching his conclusion, the ALJ never determines how much plaintiff has exaggerated her complaints.  He indicates that there is *some* basis for her symptoms, but never explains how severe her symptoms are, given the record.  Does she suffer from regular bouts of vomiting, nausea, and diarrhea? If so, how frequently?  Often enough to cause her to take two sick days a month or three unscheduled breaks a week? (emphasis added)
>
> *Spaulding*, 2004 WL 1093312 at *7

The court continued to evaluate the ALJ's opinion regarding the existence of some of plaintiff's symptoms:

> Yet, he makes no findings regarding the severity of these non-exertional limitations,

how often these limitations would interfere
with her work, nor how that interference
would affect her employability.  He only
finds that plaintiff's symptoms are not as
severe as she maintains and therefore con-
cludes that they do not impede her from work-
ing.  His conclusion does not follow from his
finding.  To conclude that plaintiff can
perform her prior work, he must determine the
severity and frequency of her symptoms.
Vague findings that plaintiff has symptoms,
but they are not as bad as she contends, are
insufficient to satisfy the inquiry into non-
exertional limitations.

*Spaulding*, 2004 WL 1093312 at *8

The ALJ concluded that Spar was capable of performing the

full range of sedentary work as his RFC finding.  In so doing,

the ALJ made a finding that Spar's chronic diarrhea could be

expected to result in some of her alleged symptoms, but the

severity, persistence, and limiting effects of her symptoms were

not entirely credible.  In making this decision, the ALJ illus-

trated that the frequency of Spar's diarrheic episodes was not

documented in the record.  The ALJ pointed to objective medical

evidence in the record which ran contrary to a claim of frequent

diarrhea, including normal serum albumin and potassium levels, an

unremarkable small bowel series, the lack of weight loss, and the

fact that Xifaxan brought Spar back to baseline.  Likewise, the

ALJ found claims that an abscess in her bowel, dilation of her

bile duct, and small bowel perforation contributed to her dis-

ability unsupported by the record.  In addition, the ALJ adopted

the opinion of Dr. Jilhewar, the ME, concerning Spar's RFC, which

stated that Spar was capable of a full-range of sedentary work.

These findings clearly establish a conflict between Spar's claimed symptoms and the objective medical evidence, and thus, they provide sufficient analysis as required by SSR 96-8p. Specifically, in addition to the illustration of inconsistencies in Dr. Kane's RFC assessment, ALJ Meyer's RFC finding discussed Spar's complaints of pain is inconsistent with Dr. Kane's assessment that pain was not an issue, as well as indicating that the severity or frequency of Spar's symptoms were not entirely credible.  Unlike the court in *Spaulding,* the ALJ here discussed in his decision his finding that Spar's testimony was not credible and the limitations she encountered due to the symptoms she had:  How often did she have diarrhea?  How often would she have to take emergency bathroom breaks?  How many days a month would her conditions cause her to be absent from work?  The ALJ addressed these aspects, concluding that "a condition that exacerbates only once every three months" then returned to baseline, would not cause Spar to be absent from work to the extent that she had testified.

In regards to the RFC, Spar also argues that the ALJ erred in not including non-severe impairments in his RFC assessment. Specifically, Spar argues that the ALJ neglected to incorporate her depression and anxiety, as well as her concentration and attention problems, into his RFC assessment.  Spar introduced evidence into the record indicating that she suffered from these conditions.  The ALJ agreed with Dr. McKian, the State Agency psychologist, that Spar's depression and anxiety disorders were

non-severe impairments and recognized Dr. McKian's diagnosis of an adjustment reaction. The ALJ found that Spar had a history of depression and anxiety but responded well to medication. Despite this determination, the ALJ was required to factor these impairments into Spar's RFC. *Villano*, 2009 WL 196550 at *4. The ME, Dr. Jilhewar, testified that he was not stating that Spar was not depressed or experiencing anxiety. Instead, the ME stated that he lacked objective documentation on the issue. This was only the beginning of the analysis.

The ALJ was required to build an accurate and logical bridge between the evidence and his conclusion. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Spar's pain, symptoms, and other impairments were not absent from the RFC. The ALJ unmistakably discussed Spar's complaints of pain and symptoms and explained the inconsistencies of those complaints, as well as clearly discussing the lack of any functional limitations based on the depression or anxiety as shown in the B Criteria and Spar's "logical, coherent, open, honest and euthymic" performance in her mental status consultative evaluation. Because the ALJ's RFC determination accounted for her allegations of pain, symptoms, and non-severe mental impairments, the court finds that the ALJ has succeeded in the construction of this bridge.

In her second assignment of error, Spar claims that the ALJ ignored answers given by the VE to hypothetical questions that were favorable to plaintiff. When hypothetical questions are posed to the vocational expert, they "ordinarily must include *all*

limitations supported by the objective medical evidence in the record." ***Steele v. Barnhart,*** 290 F.3d 936, 942 (7th Cir. 2002) (emphasis supplied)(citations omitted). However, an ALJ is justified in ignoring a response to a hypothetical if it was based on limitations and restrictions that the ALJ has justifiably rejected. ***Latkowski v. Barnhart***, 93 Fed. Appx. 963, 974 (7th Cir. 2004).

In this case, the ALJ posed two hypotheticals to the VE. In responding to the first hypothetical, which inquired into whether there were jobs available for a person of Spar's age, education, and past work experience at the sedentary level, the VE indicated that there would be thousands of jobs available to such a person. The VE's response to the second hypothetical, which provided additional limitations that the individual could stand for only two hours and sit for four hours in an eight hour day and would be absent from work for four days a month, indicated that all full time work would be eliminated. Additionally, Spar's attorney proffered three hypotheticals which added limitations in concentration and attention, problems related to stress, and the ability to take bathroom breaks for five minutes every hour. Dr. Fisher's responses limited the possible number of jobs available as compared to ALJ Meyer's first hypothetical.

Because the ALJ found that Spar was capable of performing full sedentary work and found that Spar could perform all jobs either as performed in the national economy or as she actually performed them and did not analyze her capacity under other

limitations, it appears that ALJ Meyer relied on the first hypothetical.  This was justified.  *See* ***Latkowski***, 93 Fed. Appx. at 974 ("[T]he ALJ did not mischaracterize the evidence, and the findings of the ALJ were supported by substantial evidence.  The hypothetical question relying upon those facts was therefore appropriate.").

Next, Spar claims that the ALJ's credibility determination was contrary to Social Security Ruling 96-7p.  The court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. ***Schmidt v. Astrue***, 496 F.3d 833, 843 (7th Cir. 2007); ***Prochaska v. Barnhart***, 454 F.3d 731, 738 (7th Cir. 2006)("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference.  ***Nelson v. Apfel***, 131 F.3d 1228, 1237 (7th Cir. 1997); ***Allord v. Barnhart***, 455 F.3d 818, 821 (7th Cir. 2006).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. ***Steele***, 290 F.3d at 942.  Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." ***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. §404.1529(c); *Schmidt,* 395 F.3d at 746-47 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also Indoranto v.*

*Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Carradine v. Barn-*

*hart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling,

the fact that its source is purely psychological does not disen-

title the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a signifi-
> cant factor of his or her alleged inability
> to work, the ALJ must obtain detailed de-
> scriptions of the claimant's daily activities
> by directing specific inquiries about the
> pain and its effects to the claimant.  She
> must investigate all avenues presented that
> relate to pain, including claimant's prior
> work record, information and observations by
> treating physicians, examining physicians,
> and third parties.  Factors that must be
> considered include the nature and intensity
> of the claimant's pain, precipitation and
> aggravating factors, dosage and effectiveness
> of any pain medications, other treatment for
> relief of pain, functional restrictions, and
> the claimant's daily activities.  (internal
> citations omitted)
>
> *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.
> 1994)

*See also Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir.

2001).

In addition, when the ALJ discounts the claimant's descrip-

tion of pain because it is inconsistent with the objective

medical evidence, he must make more than "a single, conclusory

statement . . . .  The determination or decision must contain

specific reasons for the finding on credibility, supported by the

evidence in the case record, and must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and

the reasons for that weight."  SSR 96-7p, at *2.  *See Zurawski*,

245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).  He must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (*quoting Clifford*, 227 F.3d at 872). When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting.  *See Zurawski*, 245 F.3d at 888 (*quoting Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original). It is equally clear that the ALJ is not required to discuss every piece of evidence in his decision.  *Clifford*, 227 F.3d at 872.

In *Lopez,* the claimant sought disability benefits due to the limited use of and pain in her left hand as well as pain in her left shoulder and wrist.  336 F.3d at 537.  The claimant testified that she had pain and swelling in her right wrist.  *Lopez*, 336 F.3d at 538.  The Social Security Administration's consulting physician diagnosed the claimant with carpal tunnel syndrome in both hands.  *Lopez*, 336 F.3d at 537.  The ALJ found no medical evidence of impairment to her right side and the plaintiff's complaints of such injury not credible.  *Lopez*, 336 F.3d at 538. The Seventh Circuit remanded the case to the ALJ, holding that

the ALJ erred in finding that there was no medical evidence in the record and ignored available evidence in making his conclusion.  *Lopez*, 336 F.3d at 540.

In *Zurawski*, a case cited by Spar, the claimant sought social security benefits for injuries and functional limitations to his back, arms, and legs, and for depression.  245 F.3d at 883.  At the hearing, the claimant described his daily activities, which included household chores, helping prepare and driving his children to school, and assisting his children with their homework.  The claimant testified that his functional limitations prohibited him from working more than three hours a day when he was taking medication.  *Zurawski*, 245 F.3d at 885. The ALJ found the claimant's complaints of disabling pain "not entirely credible."  *Zurawski*, 245 F.3d at 886.  The ALJ based his determination on "inconsistencies with the objective medical evidence, and inconsistencies with daily activities."  *Zurawski*, 245 F.3d at 887.  Noting that the ALJ pointed to evidence that would contradict the claimant's claims of pain, the Seventh Circuit held that the ALJ should have explained these inconsistencies by discussing the full range of evidence in the record. *Zurawski*, 245 F.3d at 887-88.  Therefore, the court concluded that it was unable to determine if the ALJ had adequately examined the full range of medical evidence.  *Zurawski*, 245 F.3d at 888.

Here, after reviewing the evidence in the record, the ALJ found that Spar suffered from diarrhea, which "could be expected

32

to produce *some* of her alleged symptoms."  (Tr. 27) (emphasis in
original)  However, the ALJ determined that he did not find
Spar's statements on the intensity, persistence, and limiting
effects of her symptoms entirely credible.  ALJ Meyer pointed to
a lack of documentation in the record as one basis for his
finding.  Additionally, ALJ Meyer pointed to inconsistencies in
Spar's medical record and her claims.  Specifically, the ALJ
referenced a small bowel series and colonoscopy that were unre-
markable and the fact that Spar's weight remained stable, that
her serum albumin and potassium levels remained inside the normal
reference values, that she did not show side-effects from her
medications, and that taking Xifaxan returned her to baseline.
The ALJ did reference pain by pointing to inconsistencies between
Dr. Kane's RFC assessment and her telephone conversation three
months earlier where she stated that "she was not sure how much
pain comes into it."  This was a satisfactory basis for discount-
ing a treating physician's opinions and provided proper and
sufficient analysis of her symptoms, including pain, under SSR
96-7p and 20 C.F.R. §404.1529(a).

    As her final assignment of error, Spar argues that the ALJ
erred in disregarding the medical opinion of Dr. Kane, Spar's
treating physician.  A treating source's opinion is entitled to
controlling weight if the "opinion on the issue(s) of the nature
and severity of [the claimant's] impairment(s) is well-supported
by medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the other substantial

evidence" in the record.  20 C.F.R. §404.1527(d)(2); ***Schmidt v. Astrue***, 496 F.3d 833, 842 (7th Cir. 2007); ***Gudgell v. Barnhart***, 345 F.3d 467, 470 (7th Cir. 2003).  The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." ***Clifford***, 227 F.3d at 870 (*quoting **Scivally v. Sullivan***, 966 F.2d 1070, 1076 (7th Cir. 1992)). *See also* 20 C.F.R. §404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight.  20 C.F.R. §404.1527(c)(2); ***Clifford***, 227 F.3d at 871.  Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony.  ***Schmidt,*** 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."). *See, e.g., **Latkowski***, 93 Fed. Appx. at 970-71; ***Jacoby v. Barnhart***, 93 Fed. Appx. 939, 942 (7th Cir. 2004).  Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that while a treating physician "has spent more time with the claimant," the treating physician may also "bend over back-

wards to assist a patient in obtaining benefits . . . [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)(internal citations omitted).

In the case at hand, the ALJ provided an adequate explanation of his decision to give less than controlling weight to Dr. Kane's assessment of Spar's residual functional capacity. The ALJ stated that ordinarily a treating physician's opinions would be given great, if not controlling weight. However, several inconsistencies detracted from the reliability of Dr. Kane's opinion. Particularly, the ALJ noted that Dr. Kane gave Spar a "good" prognosis and stated that she was doing very well on Xifaxan on the same day that she indicated Spar was unable to perform full-time work. Also, although she stated that pain would interrupt Spar's attention and concentration, in a telephone conversation, Dr. Kane indicated that she did not believe that pain was a symptom. Likewise, the ALJ indicated that Dr. Kane did not explain the inconsistency that existed between a condition that flared-up once every three months and could be controlled with Xifaxan, yet supported the conclusion that Spar would miss over four days of work a month. Therefore, the court finds that the ALJ's decision to afford less than controlling weight to Dr. Kane's opinion was reasonable and sufficiently articulated.

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

For the aforementioned reasons, pursuant to sentence four of 42 U.S.C. §405(g), the decision of the Commissioner is **AFFIRMED**. The Clerk is **DIRECTED TO CLOSE** the case.

ENTERED this 17th day of April, 2009

s/ ANDREW P. RODOVICH
United States Magistrate Judge